UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KGP TELECOMMUNICATIONS, LLC, f/k/a KGP Telecommunications, Inc., | Case No. 20-CV-0114 (PJS/ECW) |
| Plaintiff, | |
| v. | ORDER |
| ERVIN CABLE CONSTRUCTION, LLC, | |
| Defendant. | |

Ryan A. Olson and Daniel R. M. Haller, FELHABER LARSON, for plaintiff.

Matthew R. McBride, John C. Holper, and Quin C. Seiler, WINTHROP & WEINSTINE, PA, for defendant.

In April 2014, Google Fiber Inc. ("Google") hired the parent company of defendant Ervin Cable Construction, LLC ("Ervin") to construct portions of Google's fiber-to-the-home network ("Google projects").  Ervin then hired plaintiff KGP Telecommunications, LLC ("KGP") to keep Ervin supplied with the products it needed to do timely work on the Google projects.  After the Google projects ended, KGP had in its inventory products that it had ordered for Ervin, but that Ervin did not want (because the Google projects had ended) and that KGP could not sell to other contractors (because the products were suitable only for the Google projects).  KGP told Ervin that, under the parties' contract, Ervin was required to reimburse KGP for these leftover products.  Ervin disagreed, and this lawsuit resulted.

Both KGP and Ervin have now moved for summary judgment. In this order, the Court construes the disputed terms in the parties' contract. It is clear that, under the Court's construction, KGP is entitled to significant damages from Ervin. But because the parties did not take discovery or brief their motions with the Court's construction in mind, the record does not allow the Court to determine exactly how much Ervin must pay KGP. Thus, the Court denies both motions for summary judgment and invites the parties to confer with Magistrate Judge Elizabeth Cowan Wright about what additional discovery and proceedings are necessary for the Court or a jury to be in position to determine the amount of damages that Ervin owes KGP under the Court's construction of the parties' contract.

## I. BACKGROUND

Ervin is "a general contractor for telecommunications installation." Olson Decl. Ex. A, Pinkston Dep. 121:22–23. On April 15, 2014, Ervin's parent company and Google signed the Master Turnkey Engineering, Procurement and Construction Contract ("Google contract"), under which Ervin agreed to do construction work on particular fiber-to-the-home projects. *Id.* at 56:1–22; Olson Decl. Ex. C. In order to meet its deadlines, Ervin needed a reliable and uninterrupted supply of products, so it hired KGP to provide "supply chain and integration services." Locke Decl. ¶ 2. After months of negotiations, Ervin and KGP entered into a Master Sales Agreement ("MSA"),

effective November 1, 2014.  McBride Decl. Exs. A, G–L.  Ervin and KGP also signed statements of work ("SOWs") for Google projects in Kansas City, *id.* Ex. B, and San Antonio, *id.* Ex. C.  Those SOWs were incorporated into and became part of the MSA.  MSA §§ 3, 16.14.

Under the MSA, KGP agreed to provide a wide range of products to Ervin.  This lawsuit concerns only some of those products—specifically, what the MSA refers to as "unique products."  (Those products are identified in Schedule E[1] of the MSA.  *Id.* § 1.2 & Schedule E.)  Ervin wanted to ensure that it would always have an adequate supply of unique products so that its work would never have to be delayed or interrupted.  *See* Olson Decl. Ex. D, Ervin Dep. 43:15–24.  Two provisions of the MSA were designed to further that goal:

First, the MSA set out four key performance indicators ("KPIs") and corresponding "targets," MSA § 7.10, which were used to "track [KGP's] progress against the business objectives of" the MSA, *id.* § 1.2.  One of these KPIs was the "Inventory-to-Sales Ratio," which provided that "[d]uring the term of this Agreement, [KGP] will maintain a sixty (60)-day inventory of Unique Products based upon a rolling average of [Ervin's] previous two (2) months' usage thereof."  *Id.* § 7.10.  The Court will refer to this as the "60-day-inventory requirement."

---

[1]Schedule E was amended twice.  McBride Decl. Exs. D, E.

Second, the SOWs (which, again, were part of the MSA) required Ervin and KGP to jointly create a "stocking strategy" to ensure that "[i]tems will be stocked, as needed, to meet the . . . requirements" of § 7.10[2] of the MSA—including, of course, the 60-day-inventory requirement. McBride Decl. Ex. B at 3.[3] The first step for implementing this stocking strategy was for KGP to "establish inventory levels based upon [Ervin's] forecast." *Id.* After that, KGP was required to "conduct regular demand, inventory levels and lead time analysis to determine the levels of inventory required to support forecasted demand levels." *Id.* Ervin would review KGP's inventory recommendations and provide forecasted demand levels to assist KGP in developing the stocking strategy. *Id.* The SOWs required KGP to "place orders" with manufacturers "[b]ased on the stocking strategy." *Id.*

As noted, in order to meet the 60-day-inventory requirement, KGP needed to look *backward* to Ervin's "previous two (2) months' usage." MSA § 7.10. But the SOWs required KGP to look *forward* to Ervin's forecasts of future demand. Obviously, Ervin would sometimes forecast that it would need more of a particular unique product in the future than it had used in the recent past. Thus, the SOWs clearly envisioned that the

---

[2]The SOWs actually cite § 7.20 of the MSA, which is a drafting error. ECF No. 61 at 4 n.2; ECF No. 90 at 38.

[3]Citations use CM/ECF pagination for all exhibits, except for depositions, which use the pages of the deposition transcript.

amount of unique products stocked by KGP would exceed the bare minimum necessary to comply with the 60-day-inventory requirement. And, in practice, that is what happened. As Ervin well knew—because KGP and Ervin met frequently to discuss inventory levels, McBride Decl. Ex. F, Pinkston Dep. 14:19–16:7—KGP maintained a supply of unique products that exceeded the 60-day-inventory requirement. *See, e.g.*, Olson Decl. Ex. L at 13.

The Google projects ended in 2017, Locke Decl. ¶ 5, and Ervin stopped ordering unique products from KGP in October of that year, McBride Decl. Ex. Q at 9. As a result, KGP was left holding in its inventory unique products that Ervin did not need (because the Google projects were finished) and that KGP could not sell (because the products were unique to the Google projects). A dispute arose between Ervin and KGP over which party bore financial responsibility for the unique products left in KGP's inventory. That dispute is the subject of this lawsuit.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

### B. Ervin's Financial Responsibility

The parties devoted a substantial portion of their briefs to arguing about the meaning of the 60-day-inventory requirement in § 7.10.  Unfortunately, the parties largely talked past each other, and thus they failed to realize—until they were questioned by the Court at oral argument—that they actually agree on the meaning of § 7.10.  Specifically, the parties agree on the following:

> First, § 7.10 required KGP to stock a 60-day inventory of unique products.  At every moment during the parties' contractual relationship, KGP was required to have on hand *at least* a 60-day inventory.
>
> Second, § 7.10 did not require KGP to stock *more* than a 60-day inventory.  In other words, if at a particular moment (say, 4:00 pm on Wednesday, July 20, 2016) KGP had in stock *exactly* the number of unique items necessary to meet the 60-day-inventory requirement—and not one item more—KGP would not be in breach of the MSA at that moment.
>
> And third, § 7.10 did not *prohibit* KGP from exceeding the 60-day-inventory requirement.  In other words, if at any time KGP had in stock more than the number of unique products necessary to meet the 60-day-inventory requirement, KGP would not be in breach of the MSA.

Not only did the parties fail to recognize that they largely agreed on the meaning of § 7.10, but they also failed to recognize that § 7.10 does not directly address the

subject of their dispute. Instead, their dispute is controlled by § 7.7 of the MSA, which explicitly addresses the extent of Ervin's obligation to pay KGP for the unique products left in its inventory after the Google projects ended. Section § 7.7 provides in relevant part:

> [Ervin] is 100% financially responsible for any Unique Products purchased by [KGP] on [Ervin's] behalf (a) in the event that [Ervin's] underlying Master Turnkey Engineering Procurement and Construction Contract with Google Fiber Inc. ("Google") relating to the Project is terminated by Google for any reason; (b) in the event that the Project is abandoned, terminated or otherwise cancelled by Google for any reason; (c) in the event that the Agreement between [KGP] and [Ervin] is terminated, expires or is otherwise cancelled for any reason except termination for Material Breach; or (d) upon completion of the project (the occurrence of any of the above, a "Termination").

The parties agree that the ending of the Google projects was a "Termination" for purposes of § 7.7. Therefore, § 7.7 is crystal clear that Ervin must pay KGP "for any Unique Products purchased by [KGP] on [Ervin's] behalf." What is not crystal clear—at least to the parties—is the meaning of "on Ervin's behalf." Resolving the parties' dispute requires the Court to interpret that term.

"The primary goal of contract interpretation is to determine and enforce the intent of the parties."[4] *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018) (citation, quotation marks, and alteration omitted). To determine

---

[4] The agreement is governed by Minnesota law. MSA § 16.3.

the parties' intent, a court should look to the "contract as a whole and attempt to harmonize all of its clauses." *Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016); *see also Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003). If the contract "has only one reasonable interpretation," the contract is unambiguous, *Seagate Tech., LLC v. W. Digit. Corp.*, 854 N.W.2d 750, 761 (Minn. 2014) (citation and quotation marks omitted), and the court should "enforce the agreement of the parties as expressed in the language of the contract," *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 843 N.W.2d 577, 581 (Minn. 2014) (citation and quotation marks omitted). "Interpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous." *Staffing Specifix*, 913 N.W.2d at 692.

The MSA does not define "on [Ervin's] behalf," so the Court looks to the "plain and ordinary meaning" of that phrase. *Linn v. BCBSM, Inc.*, 905 N.W.2d 497, 504 (Minn. 2018) (citation and quotation marks omitted); *see also Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 828 (8th Cir. 2014) ("Minnesota courts rely on dictionaries for the plain and ordinary meaning of an undefined term."). Black's Law Dictionary defines "on behalf of" to mean "in the name of, on the part of, as the agent or representative of." *Behalf*, Black's Law Dictionary (11th ed. 2019).[5] This definition is a start, but to accurately

---

[5]*See also Behalf*, Merriam-Webster,

(continued...)

ascertain the meaning of "on [Ervin's] behalf," the Court must view the phrase in the context of the entire MSA. *See Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) (meaning of contract "depends, not upon words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole").

Pointing to § 7.10, Ervin argues that the MSA only required KGP to maintain a 60-day inventory of unique products, and thus only those items that made up that 60-day inventory were "purchased by [KGP] on [Ervin's] behalf." To illustrate: Assume that a widget is a unique product listed on Schedule E of the MSA. Suppose further that, based on the rolling average of Ervin's prior two-months' usage, the number of widgets that KGP was required to keep in the 60-day inventory at the time that the Google projects ended was 100. Ervin argues that if, at that time, KGP had 173 widgets in stock, only 100 of those widgets were "purchased by [KGP] on [Ervin's] behalf." The other 73 widgets, in Ervin's view, were purchased by KGP on its own behalf.

---

[5](...continued)
https://www.merriam-webster.com/dictionary/behalf (last visited Sep. 20, 2021) ("in the interest of"); *Behalf*, Oxford English Dictionary, https://www.oed.com/view/Entry/17187?redirectedFrom=behalf& (last visited Sep. 20, 2021) ("On the part of (another), in the name of, as the agent or representative of, on account of, for, instead of."); *On/in behalf of*, The American Heritage Dictionary (5th ed. 2020) ("1. As the agent of; on the part of. 2. For the benefit of; in the interest of.").

Ervin's interpretation of "on Ervin's behalf" is patently unreasonable. The MSA clearly envisioned that KGP would stock unique products in excess of those that made up the 60-day inventory and that KGP would do so on Ervin's behalf—that is, to meet Ervin's needs. To begin with, the MSA required KGP *both* to maintain a 60-day inventory at all times *and* to promptly deliver products to Ervin. *See, e.g.*, MSA §§ 7.1–7.3 (outlining order and delivery obligations); *id.* § 7.10 (creating KPI and target of 98% of orders being completed on time). Thus, it would have been impossible for KGP to fulfill its obligations under the contract if it stocked only the precise number of unique products that composed the 60-day inventory. Again, suppose that, based on the rolling average of the prior two-months' usage, the 60-day inventory required 100 widgets. Suppose further that KGP kept only 100 widgets in stock. If Ervin then ordered 30 widgets, KGP could not both (1) fill that order promptly, as the MSA required and (2) maintain at least 100 widgets in its inventory, as the MSA also required. In order to meet its obligations to Ervin, KGP *necessarily* had to keep more than 100 widgets in stock.

Ervin also overlooks the fact that the MSA (through the SOWs) required KGP to work with Ervin to develop a stocking strategy based on Ervin's forecasts of its *future* demand—forecasts that could substantially exceed the rolling average of Ervin's prior two-months' usage. The MSA also required KGP to order unique products in amounts

that were consistent with that stocking strategy.  *See* McBride Decl. Ex. B at 3 ("Based on the stocking strategy, [KGP] will[6] place orders . . . .").  And thus, if Ervin forecast that its need for widgets would increase in the near future, KGP would be breaching its contractual obligations if it stocked only 100 widgets.

For these reasons, the Court finds that Ervin's interpretation—that the only unique products that are "purchased by [KGP] on [Ervin's] behalf" are the unique products that constitute the 60-day inventory—is refuted by the text of the MSA.  As the Court has explained, the MSA (as a practical matter) requires KGP to stock unique products in excess of the 60-day inventory.  If, under the Court's hypothetical, KGP kept only 100 widgets in stock, then as soon as Ervin placed an order for widgets, KGP would have to breach either its obligation to maintain a 60-day inventory or its duty to promptly deliver unique products to Ervin.  Moreover, if KGP kept only 100 widgets in stock, it would also breach its obligation to order unique products consistently with the stocking strategy as soon as Ervin forecasted that its use of widgets would increase.  These are obligations that Ervin imposed on KGP to ensure that *Ervin's* work would not be delayed or interrupted.

Therefore, the Court interprets "any Unique Products purchased by [KGP] on [Ervin's] behalf" to mean "those Unique Products that KGP reasonably had to purchase

---

[6]As Ervin argues, "will" creates a contractual obligation.  ECF No. 78 at 8 n.2.

in order to fulfill all of its contractual obligations to Ervin"—including its obligations to (1) maintain a 60-day inventory at all times; (2) promptly fill Ervin's orders; and (3) accommodate forecasted demand pursuant to the stocking strategy.[7] Pursuant to § 7.7 of the MSA, Ervin is "100% financially responsible" for these unique products.

Given its interpretation of the MSA, the Court obviously cannot grant Ervin's summary-judgment motion, which asks the Court to hold that Ervin is liable to KGP for no more than $6,764.50—which, according to Ervin, is the value of the unique products that composed the 60-day inventory as of October 2017. McBride Decl. Exs. O at 28–29, U. But the Court also cannot grant KGP's motion for summary judgment. In its briefing, KGP asks the Court to hold that Ervin is liable to KGP in the amount of $2,720,914.44—which, according to KGP, is the value of all of the unique products that remained in its inventory at the time that the Google projects ended and that KGP was

---

[7]Ervin argues that because KGP is the inventory expert, KGP should have borne the risk of stocking more than the 60-day inventory. But the question for the Court is not who *should* have borne the risk; the question for the Court is who *did* bear the risk under the terms of the MSA.

Although the Court has not considered extrinsic evidence in interpreting the MSA because the contract is unambiguous, the Court notes that a prior version of the MSA provided that Ervin would be "100% financially responsible for any Unique Products purchased by [KGP] on [Ervin's] behalf *that is not in excess of 60 days inventory* . . . ." McBride Decl. Ex. I § 7.7 (emphasis added). *That* language would clearly have placed upon KGP the financial responsibility for items that were not part of the 60-day inventory. But for reasons that are unclear, Ervin decided to remove this language. *Id.* Ex. J § 7.7.

unable to sell to other contractors (along with losses that KGP sustained in selling leftover products for less than KGP had paid for them).[8]  ECF No. 61 at 13.  The problem is that the record does not allow the Court to determine whether KGP reasonably had to purchase all of those unique products in order to fulfill its contractual obligations to Ervin.  Because the parties did not anticipate the Court's construction of the MSA when taking discovery and briefing their summary-judgment motions, the parties did not develop a record that would allow the Court (or a jury) to determine what portion of the leftover inventory was reasonably purchased by KGP in order to fulfill its contractual obligations to Ervin.  Therefore, the Court denies both motions for summary judgment, and invites the parties to confer with Magistrate Judge Wright about what additional discovery and proceedings are necessary to create an adequate record.

### C. Interest

Because Ervin withheld payment on all of the leftover unique products—including even the $6,764.50 in unique products for which Ervin has admitted responsibility—the parties agree[9] that Ervin is obligated to pay interest under § 5.2 and § 5.3 of the MSA.  But the parties dispute whether that interest is simple or compound.

---

[8]The figure also includes $1,012,513.67 in interest.

[9]At the hearing, Ervin conceded that it was obligated to pay interest under § 5.3 of the MSA, which, in turn, requires the amount of interest to be calculated pursuant to § 5.2.  ECF No. 90 at 26.

Under Minn. Stat. § 334.01, subd. 1, "interest shall not be compounded," unless there is a "contract to pay [such] interest." *See also Coyne v. Midland Funding LLC*, 895 F.3d 1035, 1037 (8th Cir. 2018). The question, then, is whether the parties agreed in the MSA that Ervin would pay compound interest.

Section 5.2 of the MSA provides that "[a]ll items . . . that are not paid when due, are subject [to] interest on those charges equal to the lesser of 1 ½% per month or the maximum rate allowed by law." KGP points to the phrase "1 ½% per month"—emphasizing the words "per month"—and argues that this phrase reflects an agreement to pay compound interest. The Court is not persuaded.

KGP cites a range of cases in support of its position, but none of those cases apply Minnesota law or consider contractual language that is identical to the language of § 5.2, and all of those cases devote only passing attention to the compound-interest issue. For example, in *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*, the Fifth Circuit held that a contractual provision stating that "the unpaid balance shall bear interest monthly at the rate of twelve percent" required compound interest. 40 F.3d 1474, 1488 (5th Cir. 1995). The Fifth Circuit appeared to rely on *Texon Energy Corp. v. Dow Chemical Co.*, 733 S.W.2d 328 (Tex. Ct. App. 1987), which determined that a comparable interest provision required compound interest because the phrase "unpaid balance"—when read together with the word "monthly"—included interest on interest. *Exxon*, 40 F.3d at

-14-

1489. Similarly, in *Communications Network International, Ltd. v. MCI WorldCom Communications, Inc.*, the court determined that 1.5% "per month . . . shall accrue upon any unpaid balance" required compound interest, citing *Exxon*. No. 08-cv-7254 (GBD), 2010 WL 3959601, at *9 (S.D.N.Y. Sept. 14, 2010). And in *Phibro Animal Health U.S., Inc. v. Cornerstone AG Products*, the court addressed a clause imposing a "[s]ervice charge of 2% per month" on "all past-due balances." No. 03-2664 (GEB), 2006 WL 3733022, at *2 (D.N.J. Dec. 18, 2006). That clause was found to require compound interest because the "term 'past due balance' implies an amount that could include charges other than simply the original invoice amount." *Id.* at *3.

As best as the Court can tell, what was critical to all of these decisions was the use of the phrase "unpaid balance" or "past due balance"—which, when read in conjunction with a "per month" or "monthly" interest provision, arguably requires that interest be assessed on both unpaid principal *and* unpaid interest. But § 5.2 of the MSA does not refer to an "unpaid" or "past due" balance; instead, it assesses interest on "those charges," which refers to "[a]ll items not subject of a bona fide dispute that are not paid when due"—which, in turn, refers to "a charge on the invoice." MSA § 5.3. While "unpaid balance" and "past due balance" can reasonably be read to include unpaid interest, "those charges" cannot. Rather, "those charges" refers to charges for items sold to Ervin by KGP. Therefore, even if the Court agreed with the reasoning of

-15-

*Exxon*, *Texon*, *Communications Network*, and *Phibro Animal Health*, that reasoning would suggest that, under the MSA, interest is simple.

That leaves *Peerless Network, Inc. v. MCI Communications Services, Inc.*, in which a contract imposed a "late payment penalty" that was calculated by multiplying "the portion of the payment not received by the due date" by "a late factor" of 1.5% "per month." No. 14 C 7417, 2018 WL 3608559, at *4 (N.D. Ill. July 27, 2018), *rev'd in part, vacated in part*, 917 F.3d 538 (7th Cir. 2019). The court concluded that compound interest was appropriate because interest was charged at "1.5% *per month*." *Id.* *Peerless* supports KGP's argument, since it focuses its analysis on the "per month" language of the interest clause.

The Court is not persuaded by *Peerless*, however.[10] The *Peerless* court did not apply Minnesota law, nor was that court bound by a state statute comparable to Minn. Stat. § 334.01, subd. 1, which, as noted, establishes a presumption that "interest shall not be compounded."

Although the Court has not found a Minnesota case exactly on point, Minnesota courts seem to require some degree of specificity in a contractual interest clause to overcome the statutory presumption against compound interest. *See In re Est. of Lowe*, Nos. C6-93-2335, C4-93-2379, 1994 WL 323362, at *3 (Minn. Ct. App. June 5, 1994) (affirming that "[i]nterest shall be computed annually at the rate of nine (9) per cent per annum" did not call for compounding after looking to extrinsic evidence); *Pointe Sanibel Dev. Corp. v. Sundial Beach & Tennis, Inc.*, No. CO-93-595, 1993 WL 500529, at *2–3 (Minn.

---

[10]Out-of-circuit cases support the Court's conclusion. *See Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1280 (11th Cir. 2020) ("interest at . . . 1.5% per month" did not call for compound interest under Georgia law); *Berman v. B.C. Assocs.*, 219 F.3d 48, 50–51 (1st Cir. 2000) ("shall bear interest at an annual rate . . . [of no more than] 18% per year" did not allow compounding under Massachusetts law); *Acker v. Provident Nat'l Bank*, 512 F.2d 729, 739–40 (3d Cir. 1975) (finance charge at "a periodic rate of 11/4% per month" did not "constitute a contract for the payment of compound interest"); *Jordan Outdoor Enters., Ltd. v. J&M Concepts, LLC*, No. 4:18-cv-126 (CDL), 2021 WL 682068, at *1 (M.D. Ga. Feb. 22, 2021) ("interest charges at an annual rate of 1.5% per month" did not allow compound interest under Georgia law); *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, No. 1:15-cv-01136-DAD-EPG, 2019 WL 2725336, at *11–12 (E.D. Cal. July 1, 2019) ("service charge of one and one-half percent (1.5%) per month" did not call for compound interest); *G4S Secure Sols. Can. Ltd. v. Sentinel Offender Servs. LLC*, No. 8:17-cv-01161-JLS-JPR, 2018 WL 3816742, at *6 (C.D. Cal. July 17, 2018) ("the accrual of interest of one percent (1%) per month" did not call for compound interest).

Ct. App. Dec. 7, 1993) ("interest at the rate of nine percent (9%) per annum . . . on the unpaid balance" and "[i]nterest on the unpaid principal balance shall be paid monthly" did not call for compounding); *Am. Druggists Ins. v. Thompson Lumber Co.*, 349 N.W.2d 569, 573 (Minn. Ct. App. 1984) (finding no compounding when the "monthly invoices did not indicate interest was to be compounded"); *cf. Lampert Lumber Co. v. Ram Constr.*, 413 N.W.2d 878, 883 (Minn. Ct. App. 1987) (compounding proper when each billing "statement explained that the new balance contained the unpaid previous balance which included overdue interest").

This requirement of specificity makes sense. If, as *Peerless* found, contractual language as simple as "per month" were sufficient to trigger compound interest, then Minn. Stat. § 334.01, subd. 1 would be turned on its head. Compound interest would be the rule, rather than the exception (as the statute contemplates), as almost every interest clause imposes interest on a "per year," "per month," "per week," or "per day" basis.

For these reasons, the Court finds that § 5.2 is not sufficiently specific to overcome the presumption under Minn. Stat. § 334.01, subd. 1, that "interest shall not be compounded." Ervin is obligated to pay only simple interest.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT plaintiff's motion for summary judgment [ECF No. 58]

and defendant's motion for summary judgment [ECF No. 38] are DENIED. The parties are DIRECTED to schedule a status conference with Magistrate Judge Elizabeth Cowan Wright to determine what further discovery and proceedings are necessary to ascertain the amount of money that Ervin owes to KGP pursuant to this Order.

Dated:  September 21, 2021         s/Patrick J. Schiltz
                                   Patrick J. Schiltz
                                   United States District Judge